1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                         NORTHERN DISTRICT OF CALIFORNIA

7

8

9    FANG-YUH HSIEH,

10           Plaintiff,                          No. C 06-5281 PJH

11    v.                                         **ORDER GRANTING DEFENDANT'S
                                                 MOTION FOR SUMMARY JUDGMENT**
12    JAMES B. PEAKE, Secretary of the
      Department of Veterans Affairs,

13           Defendant.
     _____/
14

15          The motion of defendant James B. Peake, Secretary of the Department of Veterans

16   Affairs, for summary judgment came on for hearing before this court on March 5, 2008.

17   Plaintiff Fang-Yuh Hsieh appeared in propria persona, and defendant appeared by his

18   counsel Assistant United States Attorney Jennifer S. Wang.  Having read the parties'

19   papers and carefully considered their arguments and the relevant legal authority, and good

20   cause appearing, the court hereby GRANTS defendants' motion.

21                                    **INTRODUCTION**

22          This is an employment discrimination case brought under Title VII of the Civil Rights

23   Act of 1964, 42 U.S.C. § 2000e ("Title VII"), and the Age Discrimination in Employment Act,

24   29 U.S.C. § 621, et seq. ("ADEA").

25          Plaintiff was employed at the Cooperative Studies Program Cooperating Center

26   ("CSPCC") at the Department of Veterans Affairs ("VA") Palo Alto Health Care System,

27   from September 1994 to October 2002.  Plaintiff filed this action on August 28, 2006,

28   alleging unlawful termination and failure to hire (failure to rehire after the termination),

United States District Court

For the Northern District of California

based on sex, national origin, and age.  On September 25, 2006, plaintiff filed a first

amended complaint, clarifying that he was also alleging retaliation for engaging in prior

protected activity.

On May 23, 2007, plaintiff filed a second amended complaint, adding allegations

regarding events that occurred after he filed the original complaint, and also adding race

(Asian) as a basis for the alleged discrimination.  The Secretary now seeks summary

judgment.

**BACKGROUND**

A.      Plaintiff's Employment at the Palo Alto CSPCC

Plaintiff is a 59-year-old Taiwanese-born biostatistician.  He holds a Master's degree

in biostatistics, and a Ph.D. in statistics.   In August 1994, plaintiff accepted a "term"

appointment at the Palo Alto CSPCC as a mathematical statistician.[1]  Plaintiff signed a

document entitled "Conditions of Term Appointment," which stated, "Your job is a

temporary one. . . . [T]here is no guarantee as to how long you may be employed.  It may

be a few days or a few months, but no longer than four (4) years."

The August 31, 1994, letter informing plaintiff of the appointment stated that it would

become effective on September 18, 1994, and that it was "not-to-exceed September 17,

1997."  Plaintiff's "Notification of Personnel Action," dated September 18, 1994, states that

the "reason for temporary appointment" was "limited funding."

Plaintiff was hired for the position by Dr. Philip Lavori, the then-Director of the Palo

Alto CSPCC.[2]  In a declaration filed in support of the Secretary's motion, Dr. Lavori states

that plaintiff was hired for a term appointment because the CSPCC's budget is limited and

depends on the availability of project funding.  Plaintiff's "Notice of Personnel Action," dated

---

[1]  The VA's Cooperative Studies Program ("CSP"), a division of the VA Research and Development group, plans and conducts large clinical trials.  Through its Coordinating Centers, the CSP provides statistical and administrative support to VA investigators conducting clinical trials.  The Palo Alto CSPCC is one of five Coordinating Centers.

[2]  Dr. Lavori was the Director of the Palo Alto CSPCC from November 1992 until July 2004.

1  September 18, 1997, states that the "reason for temporary appointment" (referring to the

2  one-year extension of the term appointment) was "research project with limited funding."

3      Prior to the expiration of the term of plaintiff's appointment, Dr. Lavori extended it to

4  September 17, 1998.  On September 17, 1998, plaintiff's term appointment was converted

5  to a time-limited "Schedule B" appointment, with an end date of September 16, 2001.

6  Plaintiff's "Notice of Personnel Action," dated September 17, 1998, states that the "reason

7  for temporary appointment" was "research project."

8      Dr. Lavori states in his declaration that it was his understanding that "Schedule B"

9  positions are exempted from the Office of Personnel Management's competitive service

10 hiring process; that the VA is permitted to hire a number of investigatory and scientific

11 professionals as "Schedule B" employees; and that those positions must be project-

12 specific.  In addition, because "Schedule B" appointments are excepted from the

13 competitive hiring process, the agency is under no obligation to announce available

14 appointments.[3]  Dr. Lavori asserts that because Palo Alto CSPCC's budget fluctuates

15 according to its success in receiving project funding, the use of "Schedule B" appointments

16 allows the CSPCC to match its staffing to its variable project needs.

17      Throughout his employment with the Palo Alto CSPCC, plaintiff worked as a

18 mathematical statistician.  As a mathematical statistician, he participated in clinical projects

---

20      [3]  With the exception of certain high-level jobs, all civil service employees in the
21 executive branch of the federal government are either in the "competitive service" or in the
   "excepted service."  5 U.S.C. §§ 2102(a), 2103(a).  See Nat'l Treasury Employees Union v.
22 Helfer, 53 F.3d 1289, 1290 (D.C. Cir. 1995).  Applicants for employment in the competitive
   service must generally take a competitive examination, which is administered by the Office of
23 Personnel Management ("OPM").  The applicants are ranked according to their examination
   scores, and an agency needing to hire an employee must select from the three highest-scoring
   applicants.

24      When warranted by "conditions of good administration," the President is authorized by
25 statute to specify "necessary exceptions of positions from the competitive service."  5 U.S.C.
   § 3302(1).   The President delegated this authority to OPM, "when it determines that
26 appointments thereto through competitive examination are not practicable."  Exec. Order No.
   10,577; 5 C.F.R. § 6.1(a); see Helfer, 53 F.3d at 1291.  OPM has divided excepted service
27 positions into three categories – "Schedule A," "Schedule B," and "Schedule C."  5 C.F.R. §
   6.2. "Schedule B" positions – the type of position held by plaintiff in this case  – are "[p]ositions
28 other than those of a confidential or policy-determining character for which it is not practicable
   to hold a competitive examination."  Id.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  funded by the VA's CSP.  While at the Palo Alto CSPCC, plaintiff worked as the

2  mathematical statistician on Project 6 (a study to evaluate the effectiveness of geriatric

3  evaluation and management clinics and units) and Project 420 (a study examining two

4  methods of psychotherapy treatment for post-traumatic stress syndrome).  He also worked

5  on Project 490 (a proposed $110 million study to examine the efficacy and safety of

6  testosterone in elderly men).

7       Plaintiff testified in his deposition that his role as a mathematical statistician was to

8  help plan the design for each clinical trial; recruit patients for the trial; and collect, analyze,

9  and publish data gathered through the trial.  In addition, plaintiff coordinated with the study

10 chair (the person in charge of the clinical study), and supervised other personnel on the

11 project, including the statistical programmer.

12      Plaintiff asserts that at some point in March 2000, he sent an e-mail to Dr. Lavori

13 regarding complaints of "discriminatory treatment" by another CSPCC employee, Maryann

14 Boeger, against certain unidentified employees.  Plaintiff provides a declaration by a

15 Carmen Calderon, stating that plaintiff showed her the e-mail and told her he had sent it to

16 Dr. Lavori.  At some point in 2000, Dr. Lavori requested Dr. Kelvin Lee to look into plaintiff's

17 allegations.  Dr. Lee reported to Dr. Lavori that he was unable to find any corroboration for

18 plaintiff's allegations.

19      Around September 14, 2001, Dr. Lavori informed plaintiff in a memorandum that his

20 "Schedule B" appointment, which was set to expire on September 15, 2001, would be

21 renewed, but only for thirteen months (to October 15, 2002).

22      Dr. Lavori states that he decided not to renew plaintiff's time-limited appointment

23 beyond October 15, 2002 because plaintiff's two research projects – Projects 6 and 420 –

24 were ending, and there were no other studies available that were suited to plaintiff's skills.

25 Although plaintiff had had some initial involvement in Project 490, the CSPCC had not

26 received funding for that project.  Moreover, it was a very large study, which Dr. Lavori

27 states was not suited to plaintiff, who worked best on smaller studies.  (As it turned out,

28 CSPCC never received funding for Project 490.)

United States District Court

For the Northern District of California

1    Dr. Lavori's memo advised plaintiff that his appointment was being extended for

2   thirteen months to allow him to finish the two research projects, and to give him time to look

3   for other employment.  The memo also stated that the CSPCC had not received funding for

4   Project 490, and that even if it did, plaintiff's role would be limited to initial coordination for

5   the project, until the expiration of the thirteen-month period.  Plaintiff's last day of

6   employment at the Palo Alto CSPCC was October 15, 2002.

7    At some point in September 2001, plaintiff met with Dr. Lavori.  Dr. Kelvin Lee, the

8   Associate Director of the CSPCC was also present.  According to Dr. Lavori, he explained

9   to plaintiff at the meeting why he had decided not to renew his appointment, and also told

10  him that the term was being extended for 13 months to allow plaintiff to complete his

11  projects and find another job.  He states that he also offered to help plaintiff find another

12  job.

13    During the last year and a half of his employment at the Palo Alto CSPCC, plaintiff

14  had various disagreements with Ms. Boeger, who became the Administrative Officer for the

15  Palo Alto CSPCC in July 2001, and the Assistant Director of Operations around 2002.

16  According to Dr. Lavori, Ms. Boeger was responsible for assigning tasks, based on

17  requests from mathematical statisticians, to the CSPCC's research assistants.

18    According to plaintiff, in 2001 and 2002, he and Ms. Boeger disagreed about

19  responsibility for administrative tasks and whether plaintiff could assign administrative tasks

20  to assistants himself, without funneling those requests through Ms. Boeger; whether

21  plaintiff could have access to the government car; and whether plaintiff could be compelled

22  to move offices to allow for asbestos and other abatement conducted by CSPCC facility

23  management.  (However, Ms. Boeger never served as plaintiff's supervisor.)

24    Plaintiff claims that around March or May 2001, he included complaints about Ms.

25  Boeger in his response to an anonymous survey of all VA researchers.  The survey was

26  created at the request of the VA's Chief Research and Development Officer, to assess the

27  researchers' views of the current status of research in the VA and the effects of the VA's

28  1995 reorganization on research.  Surveys were conducted in 1998, 1999, 2000, and 2001,

5

United States District Court

For the Northern District of California

1   by Dr. David L. Ronis of the Center for Practice Management and Outcomes Research at

2   the Ann Arbor Health Services Research and Development Center of Excellence in

3   Michigan.

4        Plaintiff sent his anonymous survey responses for the 2001 survey directly to Dr.

5   Ronis.  According to plaintiff, he included with his survey responses a half-page of

6   handwritten text stating that he had received complaints from co-workers that Ms. Boeger

7   was harassing and yelling at minority employees.  He claims that even though the survey

8   was supposed to be anonymous, there was a number on it that could be used to identify

9   the person who completed it.

10       Plaintiff also claims that in 2002, he complained about Ms. Boeger in his anonymous

11  responses to an internal CSPCC staff questionnaire circulated in preparation for a staff

12  retreat.  Ms. Boeger collected the survey responses.  Plaintiff claims that he delivered his

13  response by dropping it into an envelope with three or four other survey responses.

14  B.   The Post-Employment Period

15       Plaintiff's last day at the Palo Alto CSPCC was October 15, 2002.  He claims,

16  however, that he worked for ten months after October 2002 "without pay."  When asked at

17  his deposition why he continued to do work on behalf of CSPCC after his term appointment

18  had ended, he responded that he believed that "if I keep a good relationship with them, I

19  can find a better job."  He also hoped that he would be reinstated when the CSPCC got

20  more funding.  When asked whether anyone authorized him to continue working for pay

21  after the termination, he responded, "Even when I was there, nobody even authorized me

22  to do the job because it's a – it's a collaboration.  You don't need anyone to authorize."  He

23  claimed that "nobody authorized anything, it's just a continuation of the project."

24       In September 2003, the Palo Alto CSPCC obtained funding for a new study and

25  received a new study for planning.  Dr. Lavori believed that there might be an increase in

26  the CSPCC's workload, and that it might be necessary in the future to hire another

27  mathematical statistician.  However, the CSPCC did not have enough funds at the time to

28  fill such a position.  Dr. Lavori states that at approximately that time, Surai Thaneemit-

**United States District Court**

For the Northern District of California

1   Chen, then employed at the CSPCC as a statistical programmer, approached him and

2   expressed an interest in becoming a mathematical statistician.  She had been working as a

3   statistical programmer for the CSPCC since around 1996.

4          According to Dr. Lavori, the role of a statistical programmer and that of a

5   mathematical statistician on a study are different.  The statistician has a greater

6   involvement in the operational details of initiating the study, in communicating with the

7   study's investigators, and in planning.  The statistician leads the study team.

8          Dr. Lavori states that because the Palo Alto CSPCC had extra statistical

9   programming capacity at that time, he decided to optimize the use of the existing staff and

10  promote Ms. Thaneemit-Chen to a trial period as a mathematical statistician.  After she

11  successfully completed the trial period, Dr. Lavori offered her a Schedule B appointment as

12  a mathematical statistician in April 2004.

13         Around August 2005, the VA determined that the Palo Alto CSPCC needed an

14  additional statistical programmer to work full-time on its DNA Bank project.  This position

15  was advertised in various locations in September 2005, November 2005, and January

16  2006, including on Craigslist.org.

17         According to the posting on Craigslist, the position required a strong level of

18  proficiency in the areas of verbal and written communications skills; statistical results

19  summarization; statistical modeling; interaction with statisticians, clinicians, and data

20  management personnel to establish project timelines and initiate statistical discussions;

21  leadership to junior programmers; and programming at an intermediate or advanced level

22  in SAS, S+/R.

23         The position required a minimum of a Masters in statistics or biostatistics; excellent

24  technical, analytical, and communication skills; knowledge of SAS and S+/R; and U.S.

25  citizenship.  Also desirable would be knowledge of DataFax and Unix; prior clinical research

26  and statistical methodology programming experience; and experience in report writing and

27  analysis plan design.

28         Dr. Lavori was not involved in the selection process, as he had been on "leave

7

United States District Court

For the Northern District of California

1 without pay" status since January 2005.  Jennifer Cockroft, Brian Doherty, and Ms.

2 Thaneemit-Chen were involved in the process.  Ms. Cockroft was the project manager for

3 the DNA Bank, and Mr. Doherty was the Programming Group Leader (and later, IT

4 Manager), and supervised the CSPCC's statistical programmers.  Ms. Thaneemit-Chen,

5 who had worked for CSPCC as a statistical programmer for eight years, had knowledge of

6 the exact duties and abilities required for the job.  Thus, Mr. Doherty testified that he relied

7 on Ms. Thaneemit-Chin's judgment to determine whether the programming code samples

8 submitted by the applicants evidenced that desired level of programming skill.

9         On November 6, 2005, plaintiff responded to the Craigslist posting.  Mr. Doherty

10 states in his declaration that plaintiff was not selected for an interview because he had no

11 prior work experience as a programmer and failed to provide specific examples of statistical

12 programming tools that he had used.  In addition, Mr. Doherty testified (and states in his

13 declaration), that he determined, based on consultation with Ms. Thaneemit-Chin, that the

14 SAS programming code sample that plaintiff submitted did not include any statistical

15 programming or intermediate-level coding.

16         Mr. Doherty states further that plaintiff's application did not demonstrate his ability to

17 communicate with study investigators and mathematical statisticians about the details of

18 their programming.  He asserts that although plaintiff, as a mathematical statistician, had

19 experience communicating about statistical analyses and biostatistics, the ability to

20 communicate about programming details and code is a different skill.

21         The selection committee interviewed seven candidates for the position, and on

22 March 5, 2006, hired Suzanne Wight, a Caucasian female, for the position.  At the time

23 Wight was hired, she was approximately 43 years old.  Prior to her employment at CSPCC,

24 Ms. Wight had worked as a statistical programmer in a health care environment.  In his

25 deposition, Mr. Doherty noted that Ms. Wight's resume reflected work experience as an

26 "SAS Programmer" in the health care environment, going back to March 1999, whereas

27 plaintiff's resume showed no experience as a statistical programmer, just work as a

28 statistician.

United States District Court

For the Northern District of California

C.    Plaintiff's EEO Charges

On January 9, 2002, plaintiff contacted the EEO counselor at the VA in Menlo Park, asserting that he had been discriminated against on the basis of race, national origin, and age (53 at the time).  According to the letter from the EEO counselor to plaintiff, plaintiff's proposed resolution was that he be retained to "continue working on the $110 million dollar grant that he fought for and he would like to know why Dr. Lavori is terminating his appointment."[4]

On February 11, 2002, plaintiff filed his first EEO charge, alleging that the "proposed termination of my schedule-B appointment ended October 14, 2002, is based on age, race and national origin."  He stated that the dates of occurrence were November 27, 2001 and September 14, 2001.  The September 14, 2001, date appears to be a reference to the letter from Dr. Lavori advising plaintiff that his "Schedule B" appointment would be extended for 13 months.  It is not clear what the November 27, 2001 date refers to.  The remedy sought by plaintiff was "a career appointment to work on the newly funded $110 million dollars project that two investigators and I proposed."

In a one-and-a-half page attachment to the administrative charge, plaintiff asserted that in the past 10 years, approximately 100 employees had been hired at the Palo Alto CSPCC, none of whom had received a career appointment.  He claimed that employees were "constantly fearful of being fired," and that the employee turnover had been very high. He stated that he had been hired 8 years previously, "and since then my Schedule B appointment has been successfully renewed periodically."  He claimed that he was the oldest employee without a career appointment.

Plaintiff alleged further that he and two investigators had recently written a grant for over $110 million, "which was approved pending on collecting funding from several government agencies and a private industry."  He claimed that his "sources" had told him that the collection of funding would be successfully completed "soon," but that

_____

[4] This reference to the "$100 million grant" is a reference to the funding for Project 490, which was never approved.

9

United States District Court
For the Northern District of California

1  notwithstanding this, his appointment was not being renewed, although the grant proposal

2  had "budgeted for my full time salary for the next 8 years."

3      He also claimed that he had been "told" that his job would be contracted out to the

4  Stanford University Biostatistics department, and that it was "known that none of the

5  faculties at Stanford Biostatistic department are colored people."  He asserted that the

6  previous year, CSPCC had advertised for biostatisticians, and that he had heard Ms.

7  Boeger complain that all the applicants were Asian.  He claimed that the administrative staff

8  refused to fill the positions, and that they were "bully toward Asian employees."  He

9  asserted that in the past few years, there had been quite a few complaints – both formal

10  and informal.

11      As for himself, he claimed that he had recently discovered that the Director of

12  CSPCC (referring to Dr. Lavori) had given him an "unacceptable" rating for customer

13  service on his performance review, after he had signed the performance review, and that

14  he had gone through the union and Human Resources to have the rating changed.  He also

15  attached a copy of an e-mail exchange between himself and Ms. Boeger in June 2001,

16  which appears to have something to do with their on-going dispute over the assignment of

17  work to the research assistants (though it is not entirely clear).

18      On March 2, 2002, plaintiff filed a second EEO charge alleging "non-sexual"

19  harassment by Ms. Boeger and Dr. Lavori, based on plaintiff's race, national origin, and

20  age, and also alleging retaliation for his January and February 2002 EEO activity.  Plaintiff

21  stated that the dates of occurrence were January 10, 2002, and January 17, 2002.  It is not

22  clear what these dates refer to.  The remedy sought by plaintiff was "the harassment to

23  stop and a career appointment in research."

24      Following the Administrative Judge's grant of summary judgment in favor of the VA,

25  and the VA's finding of no discrimination regarding plaintiff's first two EEO charges (Nos.

26  200O-0640-2002101704 and 200O-0640-2002101292), plaintiff appealed to the EEOC's

27  Office of Federal Operations ("OFO").  The OFO accepted the appeal, and issued a

28  decision on February 5, 2004.

The OFO summarized plaintiff's claims as alleging race, national origin, and age discrimination based on the following – (1) the Assistant Director of Operations (referring to Ms. Boeger) gave plaintiff tasks to complete and then reported that he was uncooperative; (2) Ms. Boeger yelled at plaintiff and threatened not to allow him to use the government vehicle, and plaintiff was subsequently prohibited from using the government vehicle; (3) plaintiff discovered he had received an "unsatisfactory" rating in the area of "Customer Service" after he had already signed the performance appraisal; (4) on January 17, 2002, the Director of CSPCC (referring to Dr. Lavori) assigned plaintiff more work than he could complete, and gave him a "direct order" to respond to him regarding the whereabouts of logs for specific projects; (5) on June 6, 2001, Ms. Boeger sent plaintiff an e-mail about incorrectly failing to filter his work for other employees through her; and (6) on September 14, 2001, plaintiff was informed by Dr. Lavori that his term appointment would not be renewed after October 14, 2002.

The OFO stated that after reviewing the record in its entirety, it had determined to affirm the VA's final order, because a preponderance of the record evidence did not establish that discrimination occurred.  The OFO advised plaintiff that he could file a request for reconsideration within 30 days, and that he could file a civil action within 90 days of the date of receipt of the decision.  Plaintiff apparently filed a request for reconsideration, which was denied on March 19, 2004.  Plaintiff did not file a civil action within 90 days of this final denial.

In August 2004, almost two years after plaintiff's employment at the Palo Alto CSPCC had ended, plaintiff contacted the EEO counselor at the VA, alleging that the CSPCC had failed to reinstate him when a mathematical statistician position became available around September 2003 because of his age, race, national origin, and 2002 EEO activity.  The September 2003 date appears to be a reference to the provisional (or trial) appointment of Ms. Thaneemit-Chen as a mathematical statistician.

On September 7, 2004, plaintiff filed his third EEO charge, alleging failure to hire/reinstate, based on age, sex, and national origin, and also alleging retaliation for prior

United States District Court
For the Northern District of California

1    EEO activity.  Plaintiff asserted that the date of occurrence was "October 15, 2002, to

2    present as a continuing event; July 7, 2004; August 20, 2004."

3         In the section for explanation of the claims in this third EEO charge, plaintiff stated,

4         Since the termination of my term appointment on 10/15/2002, I had continued
          to receive requests from the agency until August, 2003, to work on three
5         projects . . . . On 1/9/2002, I filed an EEO complaint on job termination.
          During the process of my EEO complaint until 3/19/2004, and continuing
6         communications through Congresswoman Eshoo until 8/19/2004 . . . I have
          continued to request reinstatement but was denied by the agency.  On
7         7/7/2004, I heard the agency had promoted a statistical programmer (Surai
          Thaneemit, BD 8/23/1972, female, national origin Thailand) to a Mathematical
8         Statistician.  I called the agency on 8/20/2004 and was told there was no
          position available for me.

9

10        This mention of Congresswoman Eshoo refers to a communication by plaintiff with

11   the office of Anna Eshoo (his Congressional representative).  On February 25, 2004,

12   plaintiff wrote Congresswoman Eshoo, complaining that "Schedule B" employees were not

13   protected from discrimination, especially age discrimination, and asking her to write the

14   Palo Alto CSPCC "to obtain a reason, if any, why I was fired at the age of 55 after a long

15   term services with excellent performance records."  Congresswoman Eshoo apparently did

16   write to Elizabeth Freeman, then-Director of the VA-Palo Alto, on March 10, 2004, and

     some exchange of correspondence followed, through approximately August 2004.

17

18        Following the VA's finding (on February 23, 2006) of no discrimination regarding

19   plaintiff's third EEO charge (No. 200N-0640-2004103984), plaintiff appealed to the OFO.

20   The OFO accepted the appeal, and issued a decision on August 14, 2006.

21        The OFO stated that plaintiff alleged sex, age, and national origin discrimination, as

22   well as reprisal for prior EEO activity, based on the VA's refusal to rehire or reinstate him to

23   the position of mathematical statistician when his term appointment ended and when he

     was not allowed to compete for the position.

24

25        The OFO stated that the record revealed that plaintiff was selected to fill a limited-

26   term appointment as a mathematical statistician in the Palo Alto CSPCC; that the original

27   term of appointment was September 18, 1994, to September 17, 1997; that the term

28   appointment was extended to September 17, 1998; that the term appointment was

United States District Court

For the Northern District of California

1   subsequently converted to an excepted "Schedule B" appointment with a not-to-exceed

2   date of September 16, 2001; that in September 2001, plaintiff was informed that his

3   appointment would be extended 13 months to allow him to complete two research projects

4   and to look for other employment; and that plaintiff's appointment was extended to October

5   15, 2002, and was not renewed.

6        The OFO noted that plaintiff had previously filed a complaint in which he had alleged

7   that he was discriminated against when his limited term appointment was not renewed, that

8   the AJ had granted summary judgment in favor of the VA, and that the OFO had affirmed

9   the AJ and denied plaintiff's request for reconsideration.

10       The OFO then reviewed the AJ's opinion granting summary judgment.  The OFO

11  noted that the AJ agreed with the VA that plaintiff had failed to contact an EEO counselor

12  within 45 days of the alleged discrimination, as required by 29 C.F.R. §§ 1614.105(a)(1).

13  The AJ found that although plaintiff had developed a reasonable suspicion of discrimination

14  as early as February 2004 (based on a written statement by plaintiff on that date to the

15  effect that he knew that the VA was promoting "Person A" – apparently a reference to Ms.

16  Thaneemit-Chen – to a biostatistician position to take over plaintiff's job), he did not contact

17  an EEO counselor until August 2004.  Nevertheless, the AJ stated that she would assume

18  that plaintiff had made timely EEO counselor contact.

19       Regarding plaintiff's claims, however, the AJ found no discrimination.  The AJ noted

20  that the record revealed that "Person A" – a Thai female born in 1972 – worked for the VA

21  as a research health science specialist, and, in September 2003, expressed an interest in

22  becoming a mathematical statistician.  After a trial period, in which she was found to be

23  qualified, her term appointment was converted to an excepted "Schedule B" appointment

24  with a not-to-exceed date of February 22, 2005.

25       Plaintiff had asserted that the VA discriminatorily distorted the "Schedule B"

26  appointment process by failing to announce existing vacancies and advertising for positions

27  assigned to research locations other than Menlo Park; that the VA provided budgeting for

28  facilities other than Menlo Park; and that he was denied discovery regarding the VA budget.

13

United States District Court

For the Northern District of California

1    The OFO found, however, that the AJ's grant of summary judgment was appropriate,

2    as no genuine issue of material fact existed.  The OFO stated that the record established

3    that the VA did not discriminate or retaliate against plaintiff for filing a complaint or for

4    complaining about discriminatory treatment against others at the VA.  The OFO found that

5    plaintiff had not established that he was denied the opportunity to be hired or considered for

6    positions within the agency, or that the agency did not adhere to processes for filling non-

7    competitive positions for prohibited reasons.

8    The OFO also found that the record established that the VA could make research

9    staff appointments without going through the competitive process – i.e., without announcing

10   vacancies or holding open competition.  The OFO found further that plaintiff had not shown

11   that the VA's reasons were pretextual, and had also failed to present evidence that the

12   VA's actions were motivated by discriminatory animus toward plaintiff's protected class.

13   With regard to plaintiff's complaints about the adequacy of discovery, the OFO found that

14   the AJ had allowed sufficient time for the completion of discovery.

15   The OFO advised plaintiff of his right to request reconsideration, within 30 days, and

16   his right to file a civil action, within 90 days of the date of receipt of the decision.  Plaintiff

17   filed the present action on August 28, 2006, approximately two weeks after the OFO issued

18   its decision.

19   On September 25, 2006, plaintiff contacted the VA EEO counselor, and alleged that

20   he had not been selected for the statistical programmer position at CSPCC, originally

21   advertised in the fall of 2005, because of his race, age, gender, national origin, and prior

22   EEO activity.  He filed a fourth EEO charge on October 20, 2006.

23   The EEO investigator's report was issued on May 7, 2007, finding no discrimination.

24   It is not clear whether plaintiff received a right-to-sue letter on this claim.  In his second

25   amended complaint ("SAC"), filed May 17, 2007, he states that he received right-to-sue

26   letters on "8/2006 and 12/2006."

27   D.   Claims Alleged in Second Amended Complaint

28   In the SAC, plaintiff checked the boxes labeled "failure to employ me" and

14

United States District Court
For the Northern District of California

"termination of my employment," and also checked "other acts," which he describes follows: "Unpaid compensation for works from October 2002 to August 2003 after termination of appointment in 2002.  Failure for re-instatements and failures for selection for positions applied."  He claims discrimination on the basis of race, sex, national origin, and age, and also alleges reprisal for prior complaints of employment discrimination.  He does not mention harassment.

Plaintiff's statement of his claims is as follows (in its entirety):

(1) I was hired as a statistician by the VA in September 1994.  After complaining about management's discrimination treatments in emails and in two VA surveys, I was terminated in October 2002.

(2) From October 2002 to August 2003, I continued to work on the same projects without compensation.

(3) While the personnel budget at Palo Alto CSPCC has been continuously increasing from 2000 to present, the agency diverted its funding, changed its advertising and hiring practices to avoid plaintiff's job application.

(4) Upon my termination in 2002, a less-qualified younger female statistical programmer had immediately taken over my position.

(5) In November 2005, I applied to an advertisement for a statistical programmer position.  I was told in late 2006 that the position had been filled by a less-qualified younger female candidate.

Plaintiff asserts that the alleged discrimination occurred on "12/01/2000 to 1/17/2007."  He claims that he filed administrative charges on "01/2002, 08/2004, 12/2006," and that the EEOC issued notices of right to sue on "08/2006 and 12/2006."  The August 2006 right-to-sue notice is the one referenced in the OFO's August 14, 2006, decision described above.  Apart from this statement in the SAC, the court has located no reference in any of the papers to a December 2006 right-to-sue letter.  The SAC contains no reference to a right-to-sue letter issued after the May 7, 2007, EEO investigator's report.

Thus, it appears that plaintiff is alleging the following claims, based on age, race, gender, and national origin discrimination and/or retaliation:  (1) that Dr. Lavori wrongfully terminated his employment at the Palo Alto CSPCC in October 2002 (although plaintiff also seems to be alleging a claim based on the notification in September 2001 that plaintiff's employment would end on October 14, 2002); (2) that plaintiff was not "reinstated" when

the mathematical statistician position filled by Ms. Thaneemit-Chen became available in 2003; (3) that he was not selected for the statistical programmer position in 2006; and (4) that he was not compensated for work he performed voluntarily after his employment was terminated and he left the Palo Alto CSPCC in October 2002.

**DISCUSSION**

A.    Legal Standard

Summary judgment is appropriate when there is no genuine issue as to material facts and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56. Material facts are those that might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party; however, where the nonmoving party will bear the burden of proof at trial, that party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Id.

Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Anderson, 477 U.S. at 250.  "To show the existence of a 'genuine' issue, . . . [a plaintiff] must produce at least some significant probative evidence tending to support the complaint."  Smolen v. Deloitte, Haskins & Sells, 921 F.2d 959, 963 (9th Cir. 1990) (quotations omitted).

The court must view the evidence in the light most favorable to the non-moving party.  United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir. 2003).  The court must not weigh the evidence or determine the truth of the matter, but only determine whether

United States District Court

For the Northern District of California

1   there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir.

2   1999).  Regardless of whether plaintiff or defendant is the moving party, each party must

3   "establish the existence of the elements essential to [its] case, and on which [it] will bear

4   the burden of proof at trial."  Celotex, 477 U.S. at 322.

5   B.     Legal Framework for Title VII Claims

6         Title VII provides that "[i]t shall be an unlawful employment practice for an employer

7   to fail or refuse to hire or to discharge any individual with respect to his compensation,

8   terms, conditions, or privileges of employment, because of such individual's race, color,

9   religion, sex, or national origin." 42 U.S.C. § 2000e-2(a) (1). The employer is also prohibited

10  from retaliating against an employee for his opposition to an unlawful employment practice.

11  See 42 U.S.C. § 2000e-3(a); Lam v. Univ. of Hawaii, 40 F.3d 1551, 1558-59 (9th Cir.

12  1994).

13        To establish a prima facie case under Title VII, the plaintiff must offer evidence that

14  gives rise to an inference of unlawful discrimination, either through the burden-shifting

15  framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), or with

16  direct or circumstantial evidence of discriminatory intent.  Vasquez v. County of Los

17  Angeles, 349 F.3d 634, 640 (9th Cir. 2004).  The McDonnell-Douglas analysis is also

18  applied in ADEA cases.  Pottenger v. Potlatch Corp., 329 F.3d 740, 745 (9th Cir. 2003).

19        Under the McDonnell Douglas analysis, the plaintiff must first provide evidence

20  showing that he/she is a member of a protected class; that he/she was performing

21  according to his or her employer's legitimate expectations, or in a failure-to-hire case, was

22  qualified for the position sought; that he/she was subject to an adverse employment action;

23  and that similarly situated individuals outside the protected class were treated more

24  favorably.  McDonnell Douglas, 411 U.S. at 802.  The burden then shifts to the employer to

25  articulate some legitimate, nondiscriminatory reasons for any adverse actions taken.  Id.  If

26  the employer meets this burden, the presumption created by the plaintiff's prima facie case

27  of unlawful discrimination "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks,

28  509 U.S. 502, 511 (1993).

United States District Court

For the Northern District of California

1    The burden then shifts back to the plaintiff, who can survive summary judgment only

2    if he/she produce sufficient evidence to raise a genuine issue of material fact as to whether

3    the defendant's proffered nondiscriminatory reason is merely a pretext for discrimination.

4    Wallis v. J.R. Simplot Co., 26 F.3d 885, 891 (9th Cir. 1994).  There are two ways a plaintiff

5    may show pretext-either (1) directly, "by showing that unlawful discrimination more likely

6    motivated the employer" or (2) indirectly, "by showing that the employer's proffered

7    explanation is unworthy of credence because it is inconsistent or otherwise not believable."

8    Dominguez-Curry v. Nevada Transp. Dep't, 424 F.3d 1027, 1037 (9th Cir. 2005); see also

9    Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981).

10   C.    Defendant's Motion

11    The government seeks summary judgment, arguing that the wrongful termination

12   and failure-to-reinstate claims are time-barred; that plaintiff cannot establish a prima facie

13   case of unlawful discrimination as to the termination of employment, the failure to reinstate,

14   or the failure to hire him for the statistical programmer position; that defendant had

15   legitimate, non-discriminatory reasons for its actions; that plaintiff cannot establish a hostile

16   work environment claim; that plaintiff cannot establish a prima facie case of retaliation; and

17   that plaintiff cannot rebut defendant's legitimate, non-retaliatory reasons.

18    In opposition, plaintiff argues that the statute of limitations on the claim of unlawful

19   termination should be tolled because of the "ongoing mediation" (referring to plaintiff's

20   communications with Congresswoman Eshoo's office) and defendant's "active deception

21   during mediation and destruction and late production of evidence," and because

22   defendants failed to produce documents they were ordered to produce by the court.

23    Plaintiff also contends that he has established a prima facie case of age, race, sex,

24   and national origin discrimination, and retaliation; that he has shown that the asserted

25   reasons for terminating him were pretextual; that he has raised a "triable issue of fact"

26   regarding his 2002 termination; and that he has shown that defendant's asserted reason for

27

28

United States District Court
For the Northern District of California

1  failing to hire plaintiff for the statistical programmer position was pretextual.[5]

2        1.     Claims of wrongful termination and failure to reinstate

3       The Secretary asserts that the claims of wrongful termination and failure to reinstate

4  are time-barred because plaintiff did not contact the EEO counselor within 45 days of the

5  occurrence of the alleged adverse actions, and because plaintiff did not file suit within 90

6  days of receiving the right-to-sue notice on those claims.

7       The EEOC has promulgated regulations governing claims brought under Title VII,

8  the ADEA, the Rehabilitation Act, 29 U.S.C. § 791, et seq., and the Equal Pay Act, 29

9  U.S.C. § 206(d) by federal employees.  See 29 C.F.R. Part 1614.  As part of exhaustion of

10  administrative remedies, a federal employee must seek EEO counseling within 45 days of

11  the date of the alleged discriminatory act, or, in the case of personnel action, within 45 days

12  of the effective date of the action.  29 C.F.R. § 1614.105(a)(1).  The 45-day time limit in

13  which to contact an EEO counselor begins to run on the date that the employee knew or

14  reasonably should have known that the discriminatory practice occurred.  29 C.F.R.

15  § 1614.105(a)(2).  "Failure to comply with this regulation is 'fatal to a federal employee's

16  discrimination claim.'"  Cherosky v. Henderson, 330 F.3d 1243, 1245 (9th Cir. 2003)

17  (quoting Lyons v. England, 307 F.3d 1092, 1105 (9th Cir. 2002)).

18       Unless the aggrieved person agrees to a longer counseling period, the EEO

19  counselor must, within 30 days of the date the aggrieved person makes EEO contact,

20  advised the aggrieved person of the right to file an administrative complaint of

21  discrimination.  29 C.F.R. § 1614.105(d).  The complaint must be filed within 15 days of the

22  date of receipt of the notice.  Id.  A civil action under Title VII may not be filed until the

23  administrative complaint process is complete and the aggrieved person has received a

24      ————————————

25      [5] The court notes that plaintiff filed a "supplemental declaration" on February 29, 2008,
26  and a "revised supplementary declaration" on March 3, 2008, seeking to make additional
arguments in support of his claim that the time for filing suit should be equitably tolled, and in
support of his assertion that the Secretary's articulated nondiscriminatory reasons for
27  employment decisions are pretextual. Under Civil Local Rule 7-3, plaintiff's opposition was due
on February 13, 2008, and the court is not required to consider any papers filed after that date.
28  The court finds, however, that plaintiff's late-filed declaration does not provide a basis for tolling
the limitations period, and does not create a triable issue with regard to pretext.

United States District Court

For the Northern District of California

1  notice of right to sue.  42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.110.

2      As an alternative to filing an administrative complaint, a federal employee claiming

3  discrimination on the basis of age may file a civil action in district court under the ADEA,

4  provided he gives the EEOC not less than 30 days notice of the intent to file such an action,

5  within 180 days of the occurrence of the alleged unlawful practice.  29 C.F.R.

6  § 1614.201(a).

7      If the aggrieved person does file an administrative complaint alleging age

8  discrimination, administrative remedies will be considered to be exhausted for purposes of

9  filing a civil action either (a) 180 days after the filing of the administrative complaint if the

10  agency has not taken final action and the individual has not filed an appeal, or (b) after final

11  action if the individual has not filed an appeal, or (c) after the issuance of a final decision by

12  the EEOC on an appeal or 180 days after the filing of an appeal if the EEOC has not issued

13  a final decision.

14          a.    Wrongful termination

15      Plaintiff asserts that his termination from the Schedule B appointment was

16  discriminatory.  As explained above, plaintiff sought EEO counseling on January 9, 2002,

17  alleging he had been discriminated against on the basis of race, national origin, and age on

18  September 14, 2001 – the date of the notice that his Schedule B appointment would be

19  terminated on October 15, 2002.

20      On February 11, 2002, plaintiff filed his first EEO charge, alleging that the proposed

21  termination on October 15, 2002, was based on race, national origin, and race.  On March

22  2, 2002, plaintiff filed a second EEO charge, alleging harassment based on race, national

23  origin, and age, and also alleging retaliation for his February 2002 EEO filing.  Thus,

24  plaintiff opted to proceed with an administrative complaint on both his Title VII claim and his

25  ADEA claim (although there is no evidence that he made contact with the EEO counselor

26  with regard to the harassment and retaliation claims).

27      Title VII requires that a civil action be filed within 90 days of the "giving of the notice"

28  of right to sue.  See 42 U.S.C. § 2000e-5(f) (1).  Here, the right-to-sue notice relating to the

20

United States District Court

For the Northern District of California

alleged discriminatory acts that occurred prior to October 2002 was contained in the EEOC/OFO's decision affirming the finding of no discrimination by the AJ. That decision was issued February 5, 2004, two and a half years before plaintiff filed the present action. Thus, any claims of discrimination, harassment, or retaliation on the basis of race or national origin based on events occurring while plaintiff was employed at the Palo Alto CSPCC are time-barred.

Thus, the claim of wrongful termination is barred, based on plaintiff's failure to file suit within 90 days of the date of receipt of the right-to-sue letter, as is any claim of "harassment" by Dr. Lavori or Ms. Boeger, based on events that occurred while plaintiff was employed at the Palo Alto CSPCC. The OFO addressed these harassment claims in its February 5, 2004, decision, and plaintiff did not file a civil action within the statutory period. Moreover, plaintiff cannot establish a "continuing violation" as to the harassment claim, as his employment ended in October 2002.

Similarly, because plaintiff opted to file an administrative action, and did not file a civil action at any time before the EEOC issued its final decision, plaintiff was required to file his civil action no later than 90 days following his receipt of the EEOC's final decision. 29 C.F.R. § 1614.407.

Accordingly, the Secretary's motion must be GRANTED as to the claim of wrongful termination.

   b. Failure to "reinstate"

Plaintiff alleges that the VA improperly failed to "reinstate" him to his former job when Ms. Thaneemit-Chen was promoted to a trial period as a mathematical statistician in September 2003, and was subsequently offered a Schedule B appointment as a mathematical statistician in April 2004.

Plaintiff contacted the EEO counselor regarding this issue in August 2004, claiming that the VA had failed to "reinstate" him because of his race, national origin, age, and 2002 EEO activity. Thus, because plaintiff failed to contact the EEO counselor within 45 days of the alleged unlawful practice, this claim is arguably time-barred.

United States District Court

For the Northern District of California

1   Plaintiff argues, however, that because he filed a third EEO charge in September
2   2004, regarding what he terms "defendants' entire course of wrongful conduct which
3   includes the 2002 termination," and because (according to plaintiff) the discriminatory
4   conduct extended from 2002 until the April 2004 failure-to-reinstate and the November
5   2005 failure-to-hire, and the right-to-sue notice on the September 2004 charge was not
6   issued until August 2006, these claims are not time-barred.  He appears to be attempting to
7   assert a continuing violation, even though he alleges discrete wrongful acts rather than a
8   course of conduct.

9   Plaintiff also argues that the limitations period should be tolled, asserting that while
10  he was waiting for the OFO's decision on his appeal of the VA's finding of no discrimination
11  on the first two administrative charges, he contacted Congresswoman Eshoo's office to
12  "mediate" his complaint.  He asserts that while that "mediation" was going on, the CSPCC
13  quietly promoted a less-qualified younger, female, statistical programmer (Ms. Thaneemit-
14  Chen) to the position of mathematical statistician.

15  The court finds that the claim of failure to "reinstate" is not actionable as part of a
16  continuing violation.  The term "employment practice" in Title VII refers to "a discrete act or
17  single 'occurrence' that takes place at a particular point in time."  Ledbetter v. Goodyear Tire
18  & Rubber Co., 127 S.Ct. 2162, 2169 (2007).  A plaintiff cannot recover for discrete acts of
19  discrimination as to which timely claims for relief have not been made.  Id.; Nat'l R.R.
20  Passenger Corp. v. Morgan, 536 U.S. 101, 110-11 (2002).  Discrete discriminatory acts are
21  not actionable if time-barred, even when they are related to acts alleged in timely-filed
22  claims.  See Morgan, 536 U.S. at 122.  Discrete acts include employment termination,
23  failure to promote, denial of transfers, reprimands, and refusals to hire.  Id. at 114. A
24  continuing violation is not present where the alleged injury is simply a subsequent effect
25  resulting from a prior discriminatory act.  See United Air Lines v. Evans, 431 U.S. 553, 556-
26  57 (1977).

27  Nor has plaintiff established that he is entitled to equitable tolling or equitable
28  estoppel.  The doctrine of equitable tolling focuses on the "plaintiff's excusable ignorance of

United States District Court

For the Northern District of California

1   the limitations period" and on the "lack of prejudice to the defendant." <u>Supermail Cargo, Inc.</u>

2   <u>v. United States</u>, 68 F.3d 1204, 1207 (9th Cir. 1995).  The Ninth Circuit allows equitable

3   tolling when a plaintiff is unable to obtain vital information bearing on the existence of his

4   claim while acting with all due diligence.  <u>Socop-Gonzalez v. I.N.S.</u>, 272 F.3d 1176, 1193

5   (9th Cir. 2001).

6        The focus in deciding the applicability of equitable tolling is on whether there was

7   excusable delay by the plaintiff.  <u>Santa Maria v. Pacific Bell</u>, 202 F.3d 1170, 1178 (9th Cir.

8   2000).  "If a reasonable plaintiff would not have known of the existence of a possible claim

9   within the limitations period, then equitable tolling will serve to extend the statute of

10  limitations for filing suit until the plaintiff can gather what information he needs."  <u>Id.</u>

11       Here, with regard to the wrongful termination claim, plaintiff received the right-to-sue

12  notice and cannot claim ignorance of the 90-day deadline to file a civil action.  Moreover, the

13  Secretary would be prejudiced by having to defend against claims that were administratively

14  adjudicated in February 2004, with no further action by plaintiff.  As for the claim of failure to

15  reinstate, plaintiff does not assert that he was ignorant of the 45-day requirement for

16  initiating EEO contact, or that he was ignorant of key information relevant to his potential

17  claim to explain why he failed to comply with the filing requirements.  In short, he fails to

18  show that his delay was excusable or provide any evidence demonstrating a reasonable

19  excuse.

20       Nor has plaintiff established that equitable tolling applies because of his

21  communications with Congresswoman Eshoo's office.  Plaintiff provides no evidence

22  showing that Congresswoman Eshoo's inquiry – at plaintiff's request – prevented him from

23  pursuing his wrongful termination claim or his reinstatement claim.  Plaintiff refers to his

24  communications with the Congresswoman's office as some sort of "mediation" of his claim,

25  but this appears to be plaintiff's own version of the facts, unsupported by evidence.

26       The doctrine of equitable estoppel focuses on the defendant's actions in preventing a

27  plaintiff from filing suit.  <u>O'Donnell v. Vencor Inc.</u>, 466 F.3d 1104, 1111 (9th Cir. 2006).

28  Generally, equitable estoppel comes into play to excuse a failure to file an EEOC charge

United States District Court

For the Northern District of California

within the requisite time period where an employer "misrepresents or conceals facts necessary to support a discrimination charge." Santa Maria, 202 F.3d at 1176-77.  Here, equitable estoppel is inapplicable as plaintiff does not allege that the Secretary  took any actions with the purpose of preventing him from bringing timely charges or concealing its alleged adverse actions against him.

Finally, as to the merits of the claim of "failure to reinstate," the evidence shows that Ms. Thaneemit-Chen was not promoted to "replace" plaintiff, as he claims.  Plaintiff's employment at the Palo Alto CSPCC ended in October 2002, while Ms. Thaneemit-Chen did not begin her training as a mathematical statistician until September 2003 – almost a year later.  Thus, plaintiff fails to establish a prima facie case as to this claim.

Moreover, Ms. Thaneemit-Chen was not given the Schedule B appointment as a mathematical statistician until April 2004, and that was only after CSPCC received a new project (and additional funding) in September 2003, and in response to her request for a promotion.  The position was not advertised, and plaintiff provides no evidence that CSPCC solicited or accepted applications for the appointment.  Nor does he articulate any basis upon which CSPCC should have considered him as a candidate.

Accordingly, the court finds that the Secretary's motion must be GRANTED as to the claim of failure to "reinstate."

2.      Claim of failure to pay

The Secretary identifies plaintiff's "failure-to-pay" claim as one of the claims asserted in the SAC, but does not discuss it as a separate claim.  As noted above, plaintiff asserts that he continued to work for the Palo Alto CSPCC after his term employment there had ended, and that he should be compensated for that work.  However, he provides no evidence showing that anyone authorized him to perform the work – and in fact, conceded in his deposition that the work was not authorized – and he plainly was not employed by the VA at the time.

In his opposition to the Secretary's motion, plaintiff claims that following his termination in October 2002, he "continued to receive requests from Study Chairs of the

24

United States District Court

For the Northern District of California

1  three studies on which Dr. Lavori stated had concluded." He cites to a letter that he wrote

2  on January 14, 2004, summarizing the "list of services" that he allegedly provided to the

3  Palo Alto CSPCC after his termination, and for which he was requesting compensation.

4  Then, in his discussion of the wrongful termination claim, he argues that "has raised an

5  inference of discrimination by showing that he has continued to work without pay on the

6  same projects with the same group of people for nearly a year after his termination, and that

7  his position was immediately replaced."

8      Thus, it is not clear whether plaintiff is asserting the "failure-to-pay" claim as a

9  separate claim, or simply as an adverse action that is part of his discrimination claim. In any

10  event, he does not have any evidence to support such a claim (other than his own self-

11  serving letter to Dr. Lavori demanding payment from CSPCC), and, given that any such

12  work was voluntary, it is not clear why any failure to pay him could provide a basis for a

13  discrimination claim. Moreover, he has not shown that any similarly-situated person who

14  was not a member of one of his protected classes was treated differently – that is, paid for

15  voluntary work after a period of term employment had ended. Finally, to the extent that

16  plaintiff does intend this as a discrimination claim, it is time-barred because he did not

17  contact an EEO counselor until August 2004.

18      3.      Claim of failure to hire

19      The Secretary argues that summary judgment should be granted as to the failure-to-

20  hire claim because the evidence is clear that the reason plaintiff was not selected to

21  interview for the statistical programmer position was that he did not have professional

22  experience as a programmer. Although plaintiff had experience working with programmers,

23  he had never actually worked as a programmer himself, whereas Ms. Wight (the person

24  hired to fill the position) had over seven years of experience working as a statistical

25  programmer on studies for Kaiser Medical Group and Kaiser Health Plan.

26      According to Mr. Doherty, the mathematical statisticians serve as leaders on the

27  CSPCC project teams, supervising statistical programmers assigned to projects, but not all

28  statisticians are qualified to be programmers, as the skills involved are very different. In Mr.

**United States District Court**

For the Northern District of California

1  Doherty's view, plaintiff did not have the skills or the experience required for the position of

2  statistical programmer.  The Secretary contends that plaintiff has produced no evidence that

3  defendant's reasons for failing to hire plaintiff as a statistical programmer were pretextual.

4  Plaintiff argues, however, that the Secretary's asserted reason for hiring Ms. Wight

5  for the statistical programmer position was pretextual.  He claims that he was "plainly

6  superior" to Ms. Wight.  In support, he cites to a chart he prepared, which is attached to his

7  declaration, purporting to show the disparities in their respective qualifications, as compared

8  with the stated requirements for the mathematical statistician position.

9  First, plaintiff notes that the job required an MS in Statistics, and points to his own

10  Ph.D. in Statistics, which he suggests makes him more qualified than Ms. Wight, who had a

11  Master's Degree.[6]  Plaintiff also asserts that he is a "well-known expert" in the required area

12  of  statistical modeling (survival, logistic, and linear regression), and claims that Ms. Wight

13  did not mention having knowledge of survival regression.  He contends that the job required

14  the ability to provide leadership to junior programmers, and claims that he supervised

15  programmers while he was employed at the Palo Alto CSPCC, while Ms. Wight had no such

16  experience.

17  He also argues that he had 30 years' experience using SAS and a few years'

18  experience with S+/R (programming languages), while Ms. Wight had 10 years' experience

19  in SAS and none in S+/R; that he worked with Datafax and Unix for over 8 years at the Palo

20  Alto CSPCC, while Ms. Wight had no experience with those systems; and that he had over

21  27 years' experience with analysis plan design, while Ms. Wight had none

22  Plaintiff also argues that the asserted reason for not hiring him – that he had not

23  worked as a full-time programmer – was pretextual, as Ms. Wight's resume shows she had

24  not worked as a full-time programmer either.

25  The court finds that plaintiff has not established a prima facie case of discrimination

26

27  ───────────

   [6]  Plaintiff refers to Ms. Wight as having a Masters of Public Health, although her

28  resume actually reflects that she had an M.P.H. in Epidemiology/Biostatistics.

United States District Court
For the Northern District of California

based on the CSPCC's decision to hire Ms. Wight, as plaintiff's application provided no evidence that he had worked as a statistical programmer.  Thus, he did not meet the primary qualification for the job.  Moreover, the Secretary has articulated a legitimate, nondiscriminatory reason for its selection of Ms. Wight to fill the position.

Contrary to plaintiff's assertion, the evidence shows that Ms. Wight had substantial experience working as a statistical programmer in the field of health care research, and also shows that she had supervised other workers.  While it is true that plaintiff had substantial experience as a mathematical statistician, the evidence shows he had no experience as a statistical programmer.  The Secretary has provided evidence showing that the skills required for a statistical programmer are different than those required for a mathematical statistician on a clinical study.

Moreover, Mr. Doherty testified in his deposition, and also states in his declaration, that he had determined, based on the assessment by Ms. Thaneemit-Chen, that plaintiff's programming sample did not demonstrate the intermediate-level coding skills required by the position.  According to Doherty, plaintiff provided a basic SAS program devoid of statistical analyses, but  Ms. Wight's code sample demonstrated her experience as an able statistical programmer.

Accordingly, the court finds that the Secretary's motion must be GRANTED as to the claim of failure to hire.  The Secretary has articulated a legitimate, non-discriminatory reason for the selection of Ms. Wight to fill the position of statistical programmer, and plaintiff has provided no evidence raising a triable issue as to whether that reason was pretextual.

4.   Claim of retaliation

Plaintiff appears to be asserting a number of retaliation claims.  First, he contends that he was terminated in October 2002 because he had complained (during the period 2000-2002, in the two anonymous surveys and in an e-mail to Dr. Lavori) about discriminatory treatment of other employees at the CSPCC.  Second, he asserts that he was not "reinstated" to his position of mathematical statistician when the funding became available in April 2004 because he had filed an administrative claim of discrimination against

27

United States District Court

For the Northern District of California

the CSPCC in 2002.  Third, he contends that he was not hired as a statistical programmer in 2005 because of his prior EEO charges and complaints of discrimination.  Fourth, he claims he was harassed in the workplace in reprisal for his EEO activities.

For the reasons stated above with regard to the discrimination claims, the retaliatory termination claim, the retaliatory failure-to-reinstate claim, and the retaliatory harassment claim are time-barred or otherwise without merit.  Thus, the only possible viable claim is the failure-to-hire claim.

To make out a prima facie case of retaliation, plaintiff must establish 1) involvement in a protected activity; 2) an adverse employment action; and 3) a causal link between the two.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002); see also Poland v. Chertoff, 494 F.3d 1174, 1179-80 & n.1 (9th Cir. 2007).  Thereafter, the burden of production shifts to the employer to proffer legitimate reasons for the adverse employment action.  Brooks v. City of San Mateo, 229 F.3d 917, 928 (9th Cir. 2000).  Once the employer carries this burden, the plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer is pretextual.  Id.

The Secretary argues that plaintiff cannot establish a prima facie case of retaliation based on the failure-to-hire claim because he does not allege an adverse employment action, as the actions plaintiff complains of did not constitute a "disadvantageous change in the workplace," or cause a material change in the conditions or terms of employment.  The Secretary also asserts that there was too long a temporal gap between the protected activities and the failure to reinstate or hire, and thus, there is no causal connection.  In addition, the Secretary asserts that plaintiff cannot rebut its legitimate, non-retaliatory reasons for deciding not to renew plaintiff's term appointment, failing to reinstate plaintiff, and failing to hire him as a statistical programmer.

In opposition, plaintiff argues that he has made out a prima facie case as to all four categories of alleged retaliation.  With regard to the claim of retaliatory failure-to-hire, plaintiff makes the same arguments he makes in support of his discriminatory failure-to-hire claim.

United States District Court

For the Northern District of California

1    As stated above, any claim of alleged retaliation based on the termination in 2002,

2  the failure to "reinstate" in 2004, or workplace harassment is time-barred, either because

3  plaintiff failed to initiate EEO counselor contact within 45 days, or because plaintiff failed to

4  file a civil action within 90 days of receiving the right-to-sue notice in February 2004, or both.

5    With regard to the claim of retaliatory failure to hire in 2005, the court is not entirely

6  persuaded by the Secretary's argument regarding the lack of an adverse action, as the

7  failure to hire would qualify in that regard.  An "adverse employment action" is "any adverse

8  treatment that is based on a retaliatory motive and is reasonably likely to deter the charging

9  party or others from engaging in a protected activity." Ray v. Henderson, 217 F.3d 1234,

10  1244 (9th Cir. 2000).  The court finds, however, that the motion must be GRANTED

11  because plaintiff has not provided evidence sufficient to create a triable issue regarding the

12  existence of a causal link between the VA's failure to hire plaintiff and plaintiff's prior EEO

13  activity.

14    Retaliatory intent can be inferred when an adverse employment action occurs within

15  a "reasonable period of time" after complaints of discrimination. Passantino v. Johnson &

16  Johnson Consumer Prods., 212 F.3d 493, 507 (9th Cir. 2000).  Here, however,

17  approximately 18 months had elapsed between plaintiff's filing of his third EEO charge in

18  September 2004, and the March 2006 decision to hire Ms. Wight for the position of

19  statistical programmer.

20    This period is simply too long to constitute sufficient circumstantial evidence of

21  causation to establish a prima facie case of retaliation. See Clark County Sch. Dist. v.

22  Breeden, 532 U.S. 268, 273-74 (2001) ("[a]ction taken . . . 20 months later suggests, by

23  itself, no causality at all"); Villiarimo, 281 F.3d at 1065 ("[a] nearly 18-month lapse between

24  protected activity and an adverse employment action is simply too long, by itself, to give rise

25  to an inference of causation").  Moreover, plaintiff provides no evidence suggesting that he

26  was singled out or was treated differently than other employees. See Brooks, 229 F.3d at

27  929 (no basis for retaliation claim absent evidence that plaintiff was singled out or treated

28  differently than other employees).

United States District Court
For the Northern District of California

1    Moreover, plaintiff has not provided evidence sufficient to create a triable issue as to

2 whether the Secretary's articulated reason for hiring Ms. Wight for the statistical programmer

3 position was pretextual.  See Lindsey v. SLT Los Angeles, LLC, 447 F.3d 1138, 1148

4 (where plaintiff provides no evidence to refute defendant's legitimate explanation, summary

5 judgment is appropriate, even though the plaintiff may have established a minimal prima

6 facie case).

7    Accordingly, the court finds that the Secretary's motion must be GRANTED as to the

8 claim of retaliation.

9 D.    Plaintiff's Claims of Discovery Abuse

10    Plaintiff asserts that the Secretary's motion for summary judgment should be denied

11 because defendant failed to produce certain documents in discovery.  It isn't clear whether

12 plaintiff is arguing that the motion should be denied as a sanction for discovery abuse, or

13 that it should be denied pursuant to Federal Rule of Civil Procedure 56(f), but in either

14 instance, the arguments are without merit.

15    Plaintiff claims that the Secretary "destroyed" evidence (apparently some e-mails that

16 were no longer on the CSPCC's system when plaintiff sought them in discovery) and

17 produced evidence "late."  He argues that the court should impose sanctions pursuant to

18 Federal Rule of Civil Procedure 37(b)(2)(A) and (C), in the form of denying defendant's

19 motion for summary judgment and giving an "adverse inference jury instruction" so that the

20 jury would be permitted to conclude that the destroyed documents contained information

21 adverse to defendant.

22    He provides a list of five documents or categories of documents that were allegedly

23 destroyed or withheld, but does not explain their significance.  These five documents or

24 categories of documents are (1) the IPA statistician contract with Dr. Bloch of Stanford,

25 which was not produced (according to plaintiff) until mid-2007; (2) plaintiff's 2000 e-mail

26 complaint to Dr. Lavori regarding discriminatory treatment of other CSPCC employees;

27 (3) plaintiff's comments regarding discrimination in the two anonymous surveys – the 2001

28 VA survey and the 2002 Palo Alto CSPCC survey; (4) documents relating to "the promotion

United States District Court

For the Northern District of California

1    of a younger female Statistical Programmer who took over plaintiff's Schedule-B Statistician

2    position during Eshoo mediation (referring to Ms. Thaneemit-Chen); and (5) documents

3    relating to the hiring of Ms. Wight in 2006, which plaintiff claims were produced only after he

4    brought a motion to compel.

5         Plaintiff also contends that he was "unable to answer" the "issues to be decided"

6    identified by the defendant in the opening brief, "due to the fact that defendant failed to

7    produce the Court-Ordered documents which are needed to justify the opposition pursuant

8    to FRCP 56(f)(1)."  However, he does not explain how these documents would provide

9    evidence sufficient to create a triable issue and defeat summary judgment.

10        The Secretary responds that all non-privileged, responsive documents have been

11   produced, and that plaintiff has provided no basis for the imposition of sanctions.  The

12   Secretary notes that plaintiff acknowledges that Dr. Bloch's IPA agreement was produced in

13   2007, and contends that plaintiff provides no support for his claim that defendant "destroyed

14   or withheld" the other four documents or categories of documents.

15        The Secretary asserts that he has produced more than 6600 documents in response

16   to plaintiff's document requests.  The Secretary provided evidence showing that he

17   searched the mail server at the Palo Alto CSPCC for e-mails dated between 1999 and 2001,

18   including e-mails between plaintiff and Lavori since 1999 with the word "Boeger;" and e-

19   mails between plaintiff and John Foesser (former Chief researcher and Development

20   Officer, and creator of the 2001 survey).  The Secretary also searched the system for

21   documents relating to the 2002 Palo Alto CSPCC survey and Lavori's paper files.

22        The Secretary contends that after 2001, CSPCC accounts were placed on the

23   servers at the VA's main facility at Palo Alto, and those servers were also searched.

24   However, the main server used for most e-mails at the Palo Alto facility retain e-mails for

25   only approximately 60-90 days.  The Secretary pulled the e-mails for numerous CSPCC

26   employees, and also searched the e-mails at the VA facility in Ann Arbor, Michigan, where

27   Ronis (who coordinated the 2001 survey) works.

28        However, the Secretary was unable to locate plaintiff's 2000 e-mail complaint to

United States District Court

For the Northern District of California

1   Lavori (which in any event was a document generated by plaintiff, not by anyone at the Palo

2   Alto CSPCC).  In March 2007, the Secretary advised plaintiff that his comments about

3   discrimination (on the survey forms) had been shredded, at his request, before any

4   summaries were created, and that all the original questionnaires were shredded some time

5   in 2002.

6          The Secretary also asserts that he also has provided all documents relating to the

7   promotion of Ms. Thaneemit-Chen, and to the decision not to hire plaintiff for the statistical

8   programmer position in 2005.

9          To the extent that either of these requests constitutes a motion, the court finds that it

10  should be DENIED.  A Rule 37 motion for sanctions does not provide a basis for denying a

11  motion for summary judgment.  Put another way, an opposition to a motion for summary

12  judgment is not a proper place for a Rule 37 motion.  In any event, a Rule 37 motion must

13  be filed as a separate motion, and in accordance with the local rules regarding the filing of

14  motions.  Civ. L.R. 37-3, 7-2, 7-8.

15         Moreover, any Rule 37 motion should have been directed to the magistrate judge to

16  whom the court referred all discovery disputes.  It is true that plaintiff filed at least one

17  motion to compel discovery, and the motion was granted in part and the Secretary ordered

18  to produce certain documents.  However, plaintiff provides no evidence that the Secretary

19  withheld documents, and no support for his claim that the destruction of old e-mails,

20  standing alone, warrants sanctions.  The Secretary, on the other hand, has clearly

21  represented that all responsive, non-privileged documents were produced.

22         Similarly, the motion does not comport with the requirements of Rule 56(f).  Rule 56

23  provides that the court may deny the motion or order a continuance, if the opposing party

24  shows by declaration that "the party cannot for reasons stated present by affidavit facts

25  essential to justify the party's opposition."  Fed. R. Civ. P. 56(f).

26         Thus, to obtain postponement or denial of a summary judgment motion for further

27  discovery, the opposing party must submit a declaration showing (a) facts establishing a

28  likelihood that controverting evidence may exist as to a particular material fact, (b) the

specific reasons why such evidence cannot be presented in opposition to the motion at the time, and (c) the steps or procedures the opposing party intends to utilize to obtain such evidence.  See Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial (2007) § 14:114.  Plaintiff has not provided such a declaration, and has not met his burden under Rule 56(f).

**CONCLUSION**

In accordance with the foregoing, the court finds that defendant's motion for summary judgment must be GRANTED.

**IT IS SO ORDERED.**

Dated: March 25, 2008

_____
PHYLLIS J. HAMILTON
United States District Judge

**United States District Court**
For the Northern District of California

33